Opinion delivered May 22, 1889.

---

No. 6509.

JAMES LEEPER v. THE STATE.

ATTEMPT TO PASS A FORGED INSTRUMENT—FACT CASE.—See the opinion and the statement of the case for evidence *held* insufficient to support a conviction for attempting to pass a forged instrument, knowing it to be forged.

APPEAL from the District Court of Callahan. Tried below before the Hon. T. H. Conner.

This conviction was for an attempt to pass a forged instrument, knowing it to be forged, and the penalty assessed by the jury was a term of two years in the penitentiary.

The instrument, as set out in the indictment, and as introduced in evidence, reads as follows:

"No. 72

Baird, Texas, 12—28, 1888.

First National Bank of Baird:

Pay to James Leeper or bearer one hundred and fifty-four dollars.

R. B. Dobson.

$154.00"

W. C. Powell was the first witness examined by the State. He testified that he was the cashier of the First National Bank of Baird in January, 1889. On the fourteenth day of that month the defendant came into the said bank, threw on the witness's counter the check in evidence and asked: "What is that good for here?" Dobson at that time had no money, or at least not enough on deposit to pay the said check, and witness called General F. W. James, the president of the bank, who was in his private room, to ascertain if Mr. Dobson could overdraw his account. General James came into the bank and said in the presence and hearing of defendant that Dobson had arranged to borrow a thousand dollars from the bank to use in the purchase of yearlings, but had not made the required security. He added, however, that if the check was given in the payment of yearlings it would be cashed, and asked defendant: "Is that check for yearlings?" Defendant replied that it was not, and that, as Dobson would be in town either on that or the next day, he would see him, arrange the matter and come back. He then left the bank, and never came back, so far as the witness knew. This check was presented to witness in the said bank on Saturday, and Dobson's dead body was brought to town on the following Monday or Tuesday. The signature "R. B. Dobson," appended to this check, in the opinion of the witness was not Dobson's signature, and witness, acting on his own responsibility, would not have paid that check except to a responsible party whose indorsement of the same would make the bank safe. At this point the witness was shown seventy-seven different checks bearing the genuine signature of R. B. Dobson. He declared that the "R. B. D" in each of the seventy-seven checks was the same in formation, and all were different from those letters in the signature to the

alleged forged forged check. In the genuine signatures the D and o in the name "Dobson" were connected, and in the alleged forged check they were separate. The witness did not particularly observe the signature at the time the check was presented to him by defendant, because he knew at once that the amount named in the check was an "overdraw,"—and Dobson had never overdrawn his account.

C. Estes testified, for the State, that he was familiar with the signature of R. B. Dobson. The signatures to the seventy-seven checks introduced in evidence as standards of comparison were genuine signatures of R. B. Dobson, but the signature to the alleged forged check was not written by Dobson. There was great uniformity in Dobson's signature. In none of the genuine signatures in evidence can it be found that the stem of the D extends above the body of the letter, as in the alleged forged signature, and while the small letters in the forgery somewhat resemble those in the genuine signatures, the "D" is separated from "obson," which is not the case in any of the genuine signatures. The witness had seen this alleged forged check before. When he first saw it there was not, as now, a small line extending from the top of the D to the o, showing an effort to connect the two letters as Dobson always connected them in writing his signature.

W. A. Hinds, ex-vice-president of the First National Bank of Baird, testified that the signature to the alleged forged check was not in the handwriting of R. B. Dobson. Ex-cashier Rushing, of the same bank, testified as did Hinds.

C. R. Corbett testified, for the State, that he and the defendant were members of the party that took Dobson's dead body to Baird, on January 16, 1888. En route the defendant remarked that Dobson owed him for some yearlings, and that he was afraid Dobson's death would render the collection of that debt troublesome and difficult. C. Stahl testified to the same effect.

J. E. W. Lane testified, for the State, that on the day Dobson's dead body was taken to town, which was January 16, defendant told him that he, defendant, and Dobson, on the evening of January 13, met about one hundred and fifty yards from Dobson's house, and had a settlement of the business and accounts then existing between them, and that no person was present at that meeting and settlement save themselves.

The State closed.

Herman Schwartz testified, for the defense, that early in January, 1888, defendant came to his store in Baird and got him to calculate the interest on a promissory note. The said note was for about one hundred and fifty dollars, was payable to the defendant and purported to have been executed by R. B. Dobson. The witness was not familiar with Dobson's signature. The interest, according to the witness's recollection, amounted to about fifteen dollars.

J. P. Hill testified, for the defense, that in April, 1887, the defendant sold two brands of cattle to Dobson, the animals aggregating thirty-five or forty head in number. Cattle at that time were worth eight or nine dollars per head. Witness knew of that sale from information derived from both defendant and Dobson; also from the fact that he, witness, as agent delivered some of the cattle, and from the further fact that Dobson gave defendant five horses, at thirty dollars each, in part payment.

John Walker testified, for the defense, that on the Friday preceding the Monday on which Dobson's dead body was taken to Baird, he bought from defendant a cow which defendant was to get from Dobson. The witness, his brother Jesse and defendant then went to Dobson's place, four or five miles north from Baird. Dobson delivered the said cow, in the pasture, to defendant, and defendant, witness and Jesse Walker drove the cow to town. The price of that cow was eleven dollars. Witness saw no papers pass between defendant and Dobson on that occasion, and heard nothing said by either of them about a settlement.

Jesse Walker, testifying for the defense, corroborated his brother John, and stated in addition that, at the time he delivered the cow to defendant, Dobson put a paper on the horn of his saddle, wrote something on it, and then handed it to the defendant, with the remark: "The cow is eleven dollars, and that leaves the amount I owe you one hundred and fifty-four dollars." This witness stated that it was not true, as testified by John Walker, that when he, John Walker, came into the pasture, the defendant and Dobson and witness were holding the cow about one hundred yards from the pasture gate.

Being pressed by the State, on cross examination, the witness stated that he "guessed" the testimony of John Walker in this respect was true, and that the statement made by him, witness, was partly true and partly false.

I. L. Merriam testified, for the defense, that in the summer of 1887 he remarked to defendant, in the presence of R. B. Dobson, that one of his, defendant's, JTL cows was at a certain place. Dobson remarked: "I now own that brand." Subsequent to that time he, had heard Dobson inquire for cattle in that brand.

Testifying as experts, Mr. Rushing and Mr. Richardson stated that a person's handwriting would vary according to the position of the body at the time of the writing. A man would not probably write the same hand using a saddle horn as a rest that he would in writing on a table. Keeping this fact in view, they stated that they could not swear, by comparison, that R. B. Dobson did not sign the alleged forged check.

F. W. James, president of the First National Bank of Baird testified, for the defense, regarding the presentation of the check at the bank by defendant, and what then transpired, substantially as did the witness Powell, for the State. He stated further that, when he told defendant that if the check was in payment of yearlings he would pay it, and asked him the question if such was the fact, defendant replied that it was not, but was in settlement of an old debt. The witness did not suspicion the genuineness of the signature until after his attention was called to an apparent variance between it and the genuine signatures in the bank, and could not now testify that the signature was not genuine.

*J. E. Thomas* and *J. J. Vardeman*, for the appellant.

*W. L. Davidson,* Assistant Attorney General, and *F. S. Bell,* for the State.

HURT, JUDGE. This is a conviction for attempting to pass a forged order on the First National Bank of Baird, purporting to have been signed by R. B. Dobson.

Appellant presented the order to the bank for payment. Dobson had no money in the bank, or not enough to pay the order. The cashier called in the president and asked him if Dobson could overdraw, and the president said, in the hearing of appellant, that "Dobson has made an arrangement with the bank to borrow one thousand dollars, but has not given the required security; Dobson is going to buy yearlings with the money, and if this (the check) is for yearlings he can get the

money." He then asked defendant if the check was for year-lings, and defendant said "no." Defendant then said that Dobson would be in town, either that day or the next day, and that he, defendant, would see him and settle the matter. Defendant did not return to the bank.

There are some strong circumstances tending to show that Dobson executed the check. On the other hand, quite a number of witnesses swore that the signature to the check was not Dobson's.

It seems that Dobson died about this time or a day or two afterwards. If dead at the time the check was presented, there was no evidence showing that appellant was aware of it. There is not the slightest proof that Dobson did not authorize appellant or some one else to write and sign his name to the check.

Under this state of case we think the evidence fails to support the verdict. If appellant knew the check to be a forgery, he certainly would not refuse to tell a lie, that being all that was required to procure the money. The check, if forged, was in itself a falsehood. This, the appellant knew. If guilty, why halt or refuse to utter another falsehood if his purpose was fraudulent?

The act of appellant being diametrically opposed to guilt, we must rather infer innocence from the circumstances tending to show that Dobson signed the check; and that the witnesses who swore that the signature was not his were mistaken, or that Dobson had authorized its execution. This inference is the only one by which all the facts in the case can be reconciled and made to harmonize.

Because the evidence is insufficient to support the verdict, the judgment is reversed and the cause remanded for another trial.

*Reversed and remanded.*